IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Derrick L. Anderson, *also known as* Derrick LaShawn Anderson<br><br>Plaintiff,<br><br>v.<br><br>Rhonda Abston, Capt.; Travis Teehan, Sgt.; and Charles Williams, Lt.,<br><br>Defendants. | Civil Action No.2:11-cv-02642-RMG-BHH<br><br>**REPORT AND RECOMMENDATION<br>OF MAGISTRATE JUDGE** |

The Plaintiff, a state prisoner proceeding pro se, brought this action pursuant to Title 42, United States Code, Section 1983. This matter is before the Court upon Defendants' Motion for Summary Judgment (Dkt. No. 15).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate for consideration.

The Plaintiff brought this action on or about September 26, 2011. On January 13, 2012, Defendants filed a Motion for Summary Judgment. (Dkt. No. 15.) By order filed January 17, 2012, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the Plaintiff was advised of the dismissal procedure and the possible consequences if he failed to adequately respond to the motion. (Dkt. No. 16.) On or about January 30, 2012, the Plaintiff filed a response opposing Defendants' Motion for Summary Judgment. (Dkt. No. 18.)

**PROCEDURAL FACTS**

Plaintiff, who is currently housed at Perry Correctional Institution ("PCI"), alleges claims pursuant to 42 U.S.C. § 1983 for "excessive force[] and cruel and unusual punishment." (See Dkt. No. 1 at 2 of 5.) Plaintiff alleges that on April 1, 2010, he did not get

out of his bed for count because he could not move due to illness. (Id. at 3.) According to Plaintiff, Defendants Abston and Teehan then came to his cell door, and Defendant Abston "told [Plaintiff] to give her [Plaintiff's] mattress." (Id.) Plaintiff refused, telling Abston, "I'm not giving you nothing that's your job to take my mattress off the top bunk." (Id.) Plaintiff further alleges that when Abston told him to put his hands behind his back, Abston "got mad" when Plaintiff stated that he wanted to talk to Major Bush. (Id.) Plaintiff states,

> [W]hen I was outside of my room Captain Abston and Sgt. Teehan had the cuffs on me in front of the whole dorm and Teehan was squeezing the cuffs on my wrist while Abston was twisting and bending my hand and wrist and they did that until my hand and wrist was swelling trying to get my key to my locker not even asking for the key just going at me like I'm not human or something. . . .

(Id.)

Plaintiff alleges that while Abston was escorting Plaintiff to lock-up, she hit Plaintiff and made him fall to the ground. (Id.) Plaintiff states that Abston called for help when Plaintiff did not get up,

> so that's when Cpl. Outlaw came to assist Abston and Teehan and then Lt. Williams came telling me to walk right boy and all kind of other words so I said a few words to him and he got mad and jacked me up with his hand on my head and one between my arms and took me to C. Dorm Z4 and threw me down on the floor and then put me on the bed and told someone to get him some scissors and cut my clothes off me and when I said some words to him that's when Lt. Williams kicked me in the mouth and I started moving around and shouting and screaming what was happening to me in CZ4 . . . .

(Id. at 3-4.) According to Plaintiff, the "Red Team" then came through lock-up, and that is when Officer Robertson "saw all of the blood." (Id. at 4.) Plaintiff alleges that he asked for medical attention, and "Nurse Jones came but Lt. Williams just told her about [Plaintiff's] hand and wrist and not [his] mouth but she claimed not to see [Plaintiff's] mouth busted . . . ." (Id.) Plaintiff further alleges that a nurse stopped by his cell several days later and that she "got [Plaintiff] an X-ray appointment but told [Plaintiff] that it was nothing that could be

2

done about [his] mouth because it was healing up." (Id.) In the "relief" section of his Complaint, Plaintiff states that he "want[s] . . . [Defendants] to pay [him] for [his] injuries, pain, and suffering." (Id. at 5.)

**APPLICABLE LAW**

**Summary Judgment Motion Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" Id. (quoting Hunt v. Cromartie, 526 U.S. 541, 552 (1999)); see also Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).

**DISCUSSION**

As noted above, Defendants seek summary judgment on Plaintiff's claims. (See Dkt. No. 15.) The undersigned will address Defendants' arguments in turn.

**A.** *Res Judicata*

Defendants first argue that they are entitled to summary judgment because Plaintiff's action is barred by the doctrine of *res judicata*. (See Dkt. No. 15-1 at 1-2 of 16.) On or about December 21, 2010, Plaintiff filed a § 1983 action against Nurse Cathy Williams, LPN, and Lt. C. Williams. See Anderson v. Jones et al., No. 2:11-cv-00005-RMG. In that previous action, Plaintiff complained about the medical care provided by Nurse Jones after Plaintiff

3

"was assaulted by an officer" on April 1, 2010. (See Compl. at 3 of 4 in No. 2:11-cv-00005-RMG.) Plaintiff also complained of Defendant Lt. C. Williams, stating,

> On my medical records it didn't show anything about my mouth but on the incident report Lt. C. Williams wrote he stated that the nurse seen me and cleaned me up and that came from the officer who assaulted me and that statement was wrong and false because it would have been on my medical files.

(Id.) In that case, the undersigned issued an Amended Report and Recommendations on November 1, 2011, wherein it was recommended that Defendants' Motion for Summary Judgment be granted. (See Dkt. No. 72 in No. 2:11-cv-00005-RMG.) On December 12, 2011, the Honorable Richard M. Gergel adopted the Amended Report and Recommendations, and granted Defendants' Motion for Summary Judgment. (See Dkt. No. 77 in No. 2:11-cv-00005-RMG.)

Defendants contend they are entitled to summary judgment in the instant action because "[t]he doctrine of *res judicata* bars a litigant from raising any new issues which were adjudicated in a prior action or that could have been litigated in a prior action." (Dkt. No. 15-1 at 2 of 16.) Although Plaintiff filed a Response in Opposition to the Motion for Summary Judgment, he did not directly address this argument. (See Dkt. No. 18.) Plaintiff argues that Defendants' Motion for Summary Judgment should not be granted "for reasons of Sgt. Travis Teehan's statement that he s[aw] blood when I walked into the cell." (Id.) He does state, however, that his "previous lawsuit . . . was on Nurse Jones not about Charles Williams[.] I had to explain why I needed medical attention and I stated that it was two different lawsuits . . . ." (Id.)

Under the doctrine of *res judicata*, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." Montana v. United States,

4

440 U.S. 147, 153 (1979).[1] "'To establish a res judicata defense, a party must establish: (1) a final judgment on the merits in a prior suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of the parties or their privies in the two suits.'" Andrews v. Daw, 201 F.3d 521, 524 (4th Cir. 2000) (quoting Jones v. SEC, 115 F.3d 1173, 1178 (4th Cir. 1997)). The claims asserted in both suits do not have to be identical; "the doctrine of *res judicata* not only bars claims that were actually litigated in a prior proceeding, but also claims that could have been litigated." Pueschel v. United States, 369 F.3d 345, 355 (4th Cir. 2004).

The parties in the instant case are not identical to the parties in Plaintiff's previous case. In the previous case, Plaintiff sued Nurse Cathy Williams, LPN, and Lt. C. Williams. See Anderson v. Jones et al., No. 2:11-cv-00005-RMG. In the instant case, Plaintiff sued Rhonda Abston, Capt.; Travis Teehan, Sgt.; and Charles Williams, Lt. See Anderson v. Abston et al., No. 2:11-cv-02642-RMG. In addition, Plaintiff's previous case (No. 2:11-cv-00005-RMG) concerned the medical care he received; the instant case concerns the alleged use of excessive force. Finally, it appears that Plaintiff exhausted his administrative remedies on these two claims at different times, and therefore could not have brought the excessive force claim at the same time as his claim related to medical care, since he received the final agency determination on the excessive force grievance on August 17, 2011–long after he filed his complaint related to medical care. (See Dkt. No. 1 at 2 of 5.) See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined

---

[1] In their Memorandum in Support of their Motion for Summary Judgment, Defendants cite South Carolina law in support of their argument on *res judicata*. (See Dkt. No. 15-1 at 1-2 of 16.) However, because Plaintiff brought his first suit in federal court, the federal rules of *res judicata* apply. See Andrews v. Daw, 201 F.3d 521, 524 (4th Cir. 2000) (citing Shoup v. Bell & Howell Co., 872 F.2d 1178, 1179 (4th Cir. 1989)).

5

in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). For these reasons, the undersigned recommends concluding that the instant action is not barred by the doctrine of *res judicata.*

**B. Failure to State a Claim**

Defendants also contend they are entitled to summary judgment because Plaintiff cannot prove that the force was applied maliciously and sadistically for theسole purpose of causing harm. (See Dkt. No. 15-1 at 2-12 of 16.) According to Defendants, "[t]he facts . . . show that the use of force was clearly necessary and not excessive in this matter." (Id. at 3.) As noted above, Plaintiff claims in his Response in Opposition that Defendants' motion should be denied "for reasons of Sgt. Travis Teehan's statement that he s[aw] blood when I walked into the cell." (Dkt. No. 18.)

To establish an Eighth Amendment excessive force claim against a prison official, an inmate must satisfy a two-pronged standard compromised of both a subjective inquiry (whether the defendant acted with a sufficiently culpable state of mind) and an objective inquiry (whether the force applied was objectively harmful enough to amount to a constitutional violation). Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). The subjective component requires an inmate to demonstrate that the force used by the officer inflicted unnecessary and wanton pain and suffering, a question that turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)). Factors the court should consider in determining whether a prison official acted maliciously and sadistically include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts

6

made to temper the severity of a forceful response. See Hudson, 503 U.S. at 7; see also Williams, 77 F.3d at 762.

To prove the objective component of an excessive force claim, an inmate "must show that correctional officers' actions, taken contextually, were 'objectively harmful enough' to offend 'contemporary standards of decency.'" Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998) (quoting Hudson, 503 U.S. at 8). Under this analysis, the court "evaluate[s] the force applied and the seriousness of the resulting injury against the need for the use of force and the context in which that need arose." Id. at 634.[2]

In support of their Motion for Summary Judgment, Defendants presented the Affidavits of Rhonda Abston, Cathy Jones, Travis Teehan, and Charles Williams. Abston, a Captain at Perry Correctional Institution, stated in her Affidavit that on April 1, 2010–the day in question–she received a call from an officer in Plaintiff's dorm stating that Plaintiff "had refused to stand for count." (Abston Aff. ¶ 4; Dkt. No. 15-4; see also Dkt. No. 15-3.) Captain Abston explained this 7:15 A.M. formal count procedure: the light in an inmate's cell must be on, and the inmate must stand by the cell door with his identification card in hand "so that officers can properly identify the inmate and make sure that the correct inmate is in the cell." (Dkt. No. 15-4 at ¶ 4.) She further states, "It is important for the security of the institution to make sure that all inmates are properly accounted for and in the appropriate location." (Id.) According to Abston, if an inmate refuses to stand for count, his mattress will be taken away for a specified period of time. (Id. ¶ 5.)

Captain Abston stated that she "went to the Plaintiff's cell and gave the Plaintiff four or five direct orders to get out of his bed," but the Plaintiff "refused to do so" and repeatedly

---

[2]In Wilkins v. Gaddy, 130 S. Ct. 1175 (2010), the Supreme Court abrogated the Fourth Circuit interpretation of Hudson requiring dismissal of excessive force claims in the absence of more than *de minimis* injury.

stated that the officers "were not going to take his mattress." (Id.) Abston states that after Plaintiff refused the four or five direct orders to get out of bed, she opened the door to Plaintiff's cell, went in, and turned the lights on. (Id. ¶ 6.) According to Abston, Plaintiff "then got out of bed, but continued to state that [the officers] would not take his mattress." (Id.) After Abston informed Plaintiff that he was going to be placed in handcuffs, Plaintiff "jerked his hands away several times," though the officers were able to place him in handcuffs. (Id. ¶ 7.) Abston informed the dorm sergeant that Plaintiff would be taken to the Special Management Unit ("SMU") and that they would need to pack up Plaintiff's belongings. (Id.) Plaintiff's belongings were in his locker, and Abston stated that they needed to get the locker key to retrieve Plaintiff's personal items. (Id.) Abston indicated that Plaintiff had the locker key in his hand and "refused to turn over the key and began to physically resist." (Id.) Abston stated that although Plaintiff "had been cursing and verbally abusive during this entire encounter, [at that point] he began yelling for other inmates to come and help him." (Id. ¶ 8.) Abston indicated that once a group of inmates began to gather outside Plaintiff's cell and refused to disperse, she decided "to remove the Plaintiff from the area as quickly as possible in order to avoid a potentially dangerous situation." (Id.)

Abston further stated in her Affidavit that although the officers were able to remove Plaintiff from the dorm, "he continued to resist . . . and we had to apply pressure on his arms in order to keep him moving forward." (Id. ¶ 9.) According to Abston, Lt. Williams met them "outside of the SMU to assist us as the Plaintiff continued to resist." (Id. ¶ 10.) She stated that once they arrived at the SMU cell for Plaintiff, she stood outside the cell door while the other officers took Plaintiff into the cell. (Id.) Abston explained that "[w]hen inmates are placed in SMU, they must be strip-searched to make sure that they do not have any weapons or contraband on their person, but the Plaintiff would not cooperate with the search." (Id.) Her affidavit further states,

8

> As the Plaintiff continued to resist, officers picked up the Plaintiff and placed him face down on the bed in the cell. Correctional officers are trained to place an inmate on the ground or other surface in order to better control the situation as it is much easier to restrain and control an inmate once they are on the ground. Placement of an inmate on the ground is done for security reasons as there is less chance of injury to the inmate as well as to the correctional officers involved. After the Plaintiff was placed face down on the bed, his clothes were cut off so that he could be searched. The Plaintiff continued to resist and was thrashing around on the bed.

(Id. ¶ 11.)

Abston explains that officers were able to "safely remove the Plaintiff's handcuffs" and contact medical staff to examine the Plaintiff. (Id. ¶ 13.) She stated that "[m]edical personnel are required to examine an inmate any time there is a use of force on an inmate even if there are no visible injuries." (Id.) She explained that the nurse arrived to examine the Plaintiff, but the Plaintiff "continued to be extremely agitated and verbally abusive and threatening." (Id.) Abston stated,

> As the Plaintiff continued to be extremely agitated and verbally abusive and threatening, it was too dangerous to have the nurse examine the Plaintiff at that time. In order for the nurse to do a complete examination of the Plaintiff, he would have to be placed in handcuffs and removed from his cell. The Plaintiff was not cooperating with any verbal commands and if he would not willingly come to the cell door to be placed in handcuffs, the only alternative would be to enter his cell and use necessary force to place the Plaintiff in handcuffs. This would create a risk of injury to both the Plaintiff and officers and, therefore, the nurse examined the Plaintiff through the window in his cell. I did not observe any injury to the Plaintiff and the Plaintiff was in no apparent distress.

(Id. ¶ 14.) She further stated that "[a]t no time did any officer kick, hit, or strike the Plaintiff" and that officers "used only the minimal amount of force necessary to control the situation and the minimal amount of force used was required due to the actions of the Plaintiff." (Id. ¶ 15.)

The Affidavits of Officer Travis Teehan and Defendant Williams vary little from Abston's Affidavit. (See Dkt. No. 15-8; Dkt. No. 15-7; Dkt. No. 15-10; Dkt. No. 15-9.)

Williams does state, however, that as Plaintiff was resisting while in the SMU cell, "we picked up the Plaintiff and placed him face down on the bed in the cell." (Dkt. No. 15-10 at ¶ 6.) According to Williams, Plaintiff "struck the bed frame when he was placed onto the bed as a result of his continued resistance." (Id.) Williams stated that he "observed a very small cut to the Plaintiff's lip[] but did not observe any further injuries." (Id.) Officer Travis Teehan's Affidavit states, "While placing the Plaintiff in the cell in SMU, I observed some blood on the Plaintiff's mouth, but did not observe any other injuries." (Teehan Aff. ¶ 11; Dkt. No. 15-8.)

The undersigned recommends granting Defendants' Motion for Summary Judgment on Plaintiff's claim for excessive force. As noted above, there are four factors a court should consider in examining whether a prison official acted maliciously and sadistically: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response. See Hudson, 503 U.S. at 7; see also Williams, 77 F.3d at 762. The evidence presented by Defendants reveals that Plaintiff was ignoring officers' orders, resisting the officers' attempts to seek compliance with the orders, cursing at the officers, and threatening them. (See generally Abston Aff.; Williams Aff.) Plaintiff did not dispute this evidence and indeed even alleges in his Complaint that he refused to follow orders. In light of this undisputed evidence, it is clear there was a need for application of force. See Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); see also Alston v. Mcrainey, No. 5:10-CT-3007-BO, 2011 WL 3904616, at *3 (E.D.N.C. Sept. 2, 2011) ("While Alston contends he complied with the order to be handcuffed, he states he was not moving quickly enough for the guard. Therefore, by his own account, the guard's actions which constituted a single strike were

caused by the guard's thought the inmate was malingering and failing to comply with a direct order. Thus the action, while in hindsight, may have been unnecessary, it was applied in good faith.").

The other factors also weigh in favor of granting Defendants' Motion for Summary Judgment. The second factor is the relationship between the need for application of force and the amount of force used. In the instant case, the relationship was appropriate. Plaintiff refused to comply with several orders and was continuously resisting. Defendants used a small amount of force to place Plaintiff in handcuffs and to escort him to SMU. Once in SMU, Defendants used the force necessary to obtain the required strip search. The third factor is the threat reasonably perceived by the responsible officials. Abston and Teehan stated in their Affidavits that when Plaintiff began to physically resist, he called for other inmates to come and help him. (Dkt. No. 15-8 at ¶ 7; Dkt. No. 15-4 at ¶ 8.) They stated that although the group of gathering inmates was ordered to disperse, they did not do so, which was cause for concern because there were approximately 96 inmates in this wing and only three officers. (Dkt. No. 15-4 at ¶ 8; Dkt. No. 15-8 at ¶ 8.) Finally, it appears that Defendants did make at least some effort to temper the severity of a forceful response. Plaintiff was given several verbal orders and refused to comply with all of them.

Analysis of the four factors set forth in Whitley counsels in favor of granting Defendants' Motion for Summary Judgment. Although Plaintiff contends that Defendants' motion should be denied because "of Sgt. Travis Teehan's statement that he seen blood when [Plaintiff] walked in the cell," the undersigned disagrees. (See Dkt. No. 18.) "[T]he fact that an injury occurred does not mean that excessive force was used." Smalls v. Dorchester County Sheriff's Dept., No. 9:10-0421-MBS-BM, 2011 WL 1042764, at *6 (D.S.C. Feb. 16, 2011), adopted at 2011 WL 979030 (Mar. 18, 2011); see also Wilkins v. Gaddy, 130 S. Ct. 1175, 1178 (2010) ("The core judicial inquiry . . . was not whether a certain quantum of

11

injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." (internal quotation marks omitted)); cf. Massasoit v. Carter, 439 F. Supp. 2d 463, 482 (M.D.N.C. 2006) ("While Dowdy's shoulder was injured, the fact of injury alone does not show the force to have been excessive."). The undersigned therefore recommends granting Defendant's Motion for Summary Judgment (Dkt. No. 15.)[3]

## **CONCLUSION**

Wherefore, it is RECOMMENDED that the Defendants' Motion for Summary Judgment (Dkt. No. 15) be GRANTED.

IT IS SO RECOMMENDED.

                                            s/Bruce Howe Hendricks
                                            United States Magistrate Judge

June 1, 2012
Charleston, South Carolina

**The plaintiff's attention is directed to the important notice on the next page.**

---

[3] Defendants make several other arguments in their Motion for Summary Judgment. (See Dkt. No. 15-1.) For example, Defendants assert they are entitled to Eleventh Amendment Immunity, and are not "persons" subject to suit under 42 U.S.C. § 1983, to the extent they are sued in their official capacity. (See id. at 14-15.) These arguments are not dispositive, given that Defendants appear to be sued in their individual capacities. Defendants also seek summary judgment on the basis of qualified immunity. (Id. at 12-14.) The doctrine of qualified immunity protects governmental officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). When an official properly asserts the defense of qualified immunity, the official is entitled to summary judgment if either: (1) the facts, taken in the light most favorable to the plaintiff, do not present the elements necessary to state a violation of a constitutional right; or (2) the right was not clearly established, such that it would not have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). In light of the analysis in Part B, should the District Judge reach the issue of qualified immunity, the undersigned recommends granting summary judgment on that basis.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).